Graham, Judge,
delivered the opinion of the court:
This is a suit brought by the Hardware Underwriters and the National Hardware Service Corporation, a corporation described as attorney in fact and trustee, to recover monthly premium taxes assessed and collected by defendant under the provisions of sections 504 (b) of the revenue act of 1917 and 503 (b) of the revenue act of 1918, respectively, for the period beginning November 1, 1917, and ending December 31, 1921.
During this period about 4,000 hardware merchants, made up of individuals, partnerships, and corporations, called *276 subscribers, through a common agent or attorney in fact were engaged in the business of making, issuing, and renewing fire-insurance contracts upon the reciprocal or inter-insurance plan, with the common object of securing fire insurance and protection for themselves at cost.
Each subscriber applying for insurance executed a subscriber’s agreement in common or identical form appointing Leon D. Nish (Inc.) (this name was changed to National Hardware Service Corporation since this suit was brought), attorney in fact. The essential details of this agreement are discussed further on.
During said period there was issued to each subscriber an insurance contract executed in the name of the subscribers by Leon D. Nish (Inc.) as attorney in fact, and each subscriber at the time his contract went into effect was required to pay a sum fixed by the attorney in fact, payment of which was a necessary prerequisite to the issuance or renewal of the insurance contract.
All moneys received by the attorney in fact, less 25% for his compensation, expenses, etc., and all interest earned on cash in bank and on investments were deposited in bank and commingled in one common fund to the credit of t&e advisory committee, trustee for the subscribers.
The meetings of the subscribers were held annually, at which the advisory committee was elected and reports were received from said committee. The advisory committee was authorized to and did adopt rules and regulations for the conduct of the subscribers’ business. They selected a chairman, vice chairman, and treasurer, and named an executive committee to have general supervision and control of the business between the meetings of the advisory committee. Under the rules and regulations the attorney in fact acted under the direction of these committees.
A surplus was accumulated to the credit of the subscribers and was in the hands of the advisory committee as trustee for the subscribers.
All taxes sought to be recovered in this suit were paid with money of the subscribers from the common fund. No part of it was paid with money belonging to Leon D. Nish (Inc.).
*277 The subscribers were changing from time to time during each year by reason of the expiration of contracts, the making of new contracts with new subscribers, the cancellations by subscribers or cancellation by the attorney in fact when money called for was not paid. So that many subscribers who were such at the time the taxes were paid have ceased to be subscribers and have been settled with and their accounts closed.
The association did a large business of reinsurance with other companies, was licensed by a majority of the States, and conducted its business with subscribers in 27 States of the Uniop.
The applicable statutes[3] are quoted below.
In order to reach a proper conclusion in the matter it is necessary to analyze somewhat the character of the plaintiffs, their purpose, and the end accomplished.
*278 What is the purpose of this association? It is to secure the making of insurance, and in the pursuit of that purpose, it issues policies, collects premiums, and pays losses. From the fund collected as premiums a certain percentage is set aside for expenses. The balance of the fund arising from deposits or premiums and income from investments is placed in bank subject to check and from it are paid the losses. The only difference between it and the ordinary mutual insurance company is that the subscribers do not mutually guarantee each other’s losses. But the result is the same. The purpose is insurance solely for the benefit of the members of the association and those insured; that is,fthere are no stockholders ás in the ordinary insurance company, the members reaping the benefits and making good the losses. In addition to the attorney in fact its organization consisted of an advisory committee, elected annually, which elected a chairman, vice president, and a manager. These officials constituted the executive committee and had general supervision and control of the affairs when the advisory committee was not in session. The association is not incorporated, but this does not alter the fact that it is, in substance and in result of its operations, a mutual insurance company or a *279 reciprocal association for the purpose of making insurance and securing protection and paying losses. Its method is for each member to make a deposit with the attorney in fact, who has a fixed office, and is the attorney in fact for each and every person entering the association, and nominally, as a matter of bookkeeping, the deposit of each member is kept separate from the others, but, after deducting a percentage for expenses, etc., the whole of the fund secured from the members is deposited as one fund in the name of the trustees. The attorney in fact decides who shall be insured, solicits the insurance, issues the policies, cancels them when premiums are not paid, and pays the losses out of the general fund in bank with the approval of the advisory committee. To say that such an association is a mere place is to say that a written constitution that has been put in operation is still nothing more than a scrap of paper. This association is not a mere place; it is a living entity doing an insurance business through cooperation of its subscribers with the attorney in fact and advisory committee and performs all those things necessary to carry on effectively the business of making insurance.
Let us look at this so-called attorney in fact, in this case a corporation. It will be seen that it is not the case of an ordinary attorneyship in fact. There is joined with it a distinct and real interest which pervades and controls the operations of the association. His power of substitution can be vetoed only by the advisory committee, chosen annually by the subscribers. This body also passes upon the investment of funds and deposits by the attorney, and payment of losses is by and with its advice and consent.
The attorney decides as to who may be accepted as subscribers, what rates of indemnity must be paid, what subscribers must pay from time to time to meet good losses, cancellation of contracts and thus the termination of the subscribers’ relations with the association, the settlement and payment of losses with the approval of the advisory committee, the compromise of claims — in short, practically all of the powers which a board of directors might exercise, in addition to certain important ones which they could not. The attorney in fact for his services as the director of the *280 concern receives a certain fee from each subscriber on his application for insurance, 25% of all commissions received; and out of it he pays all expenses incident to conducting the exchange of insurance authorized, except losses in adjusting losses, fees and taxes, legal expenses, and expenses of the advisory committee. He is therefore much more than the ordinary attorney in fact. He is the engine for which the subscribers furnish the fuel. From the foregoing it is plain that the attorney and the subscribers are in cooperation in the accomplishment of a certain purpose.
It is not necessary to classify this concern as an association. The statute uses the word “person.” This, of course, includes the plural. If these persons, whether technically or not, in effect are an association, issue insurance policies, whether unto themselves or others, the tax is payable. The name of the business or the place where it is transacted is not material. The right to tax does not depend upon either.
It is contended that the subscribers are individuals and separate; that their transactions are individual and not connected ; that what is paid by each subscriber is a deposit and not a premium; that each subscriber has a separate contract of indemnity for loss with each of the other members and is liable on a separate undertaking. But this is mere theory. When it comes to an examination of the practice it has no application. The subscribers do not issue the policies and do not pay the losses. They are assessed from time to time to cover losses and expenses. The controlling factor who fixes the amount of this assessment is the attorney in fact, not the subscribers, and, if the subscribers fail to pay, their insurance ceases and their relations as subscribers are terminated. The attorney adjusts a loss where it occurs and pays it from the accumulated fund. The investments are made by the attorney, with the approval of the advisory committee, and the reservations maintained out of funds’not immediately required, and to all practical and outward indications the attorney .in fact runs the business as any other large business is run. The fact that the business is not conducted solely for profit does not relieve it from taxation. Whatever *281 the plan of bookkeeping may be, tlie premiums, less the attorney’s commission, are placed in bank as a whole, and losses and expenses are paid out of it without action by or reference to the subscribers, individually or collectively, or contribution by them other than by the payment of premiums.
The tax is imposed upon the issuance of the policy; that is, the contract of indemnity, the amount being regulated by the premium paid. The contract of indemnity in this case was issued by a central agency, thus fixing liability for taxation for the issuing of the policy under the revenue act, and the amount of tax payable was fixed by the premium which was received. The power of attorney authorizes the attorney in fact to pay taxes out of premium receipts, presumably all lawful taxes.
There is nothing in the act which interferes in any way with the power of Congress to tax an association, which, although unincorporated, transacts its business as if it were incorporated, and the power to tax such an association is not affected by the fact that under the law of the State in which it does business it is not regarded as a legal entity where the shareholders are individually liable for its deeds. United States v. Childs, 266 U. S. 304, 309; Burk-Waggoner Oil Association v. Hopkins, 269 U. S. 110; Steedman et al. v. United States, 63 C. Cls. 226; Mary S. Aldridge, executrix, v. United States, 64 C. Cls. 424; Boston & Maine R. R. v. United States, 265 Fed. 578; and N. Y., N. H. & H. R. R. v. United States, 269 Fed. 907.
An “ association ” has been defined, with approval by the Supreme Court, “ as a body of persons organized for the prosecution of some purpose, without a charter but having the general form and mode of procedure of a corporation.” It is clear in this case that the individuals or subscribers were engaged in the prosecution of a common enterprise, to wit, the business of a mutual insurance company, and had the general purpose and accomplished the same end as a formally incorporated association.
The purpose of the policyholder in both a mutual company and reciprocal association such as this is to obtain insurance *282 at cost. The policyholders are the ultimate insurers in either case. The premiums or deposits, or whatever they may be called — because the name is not important, as in each case it is a sum paid for protection — provide the funds for payment of losses and expenses and to maintain those reserves which the law requires. These premiums are irrevocably pledged for the payment of these losses and expenses. Penn Mutual Life Insurance Co. v. Lederer, 252 U. S. 528, 533 et seq.
This association is a taxable entity. The court will regard the methods and forms used for the prosecution of a common enterprise; that is, insurance business conducted through an unincorporated association with a common purpose and with a common plan of cooperation. See Burk-Waggoner Oil Association, v. Hopkins, supra, and John L. Pickering v. Alyea-Nichols Co., 21 Fed. (2d) 501. In the latter case the principles involved in the instant case are very fully and clearly discussed, by Judge Alschuler, who delivered the opinion of the court.
The next question raised here is whether under the statute this association is exempt from taxation. There is a stipulation in connection with this case, signed by nineteen other associations of similar kind, agreeing to be bound by the decision in this case. Therefore it appears that the construction given the statute in this case by the Commissioner of Internal Revenue has been of frequent and general application, and the interpretation is therefore entitled to weight with a presumption in its favor. United States v. Philbrick, 120 U. S. 52, 59; National Lead Co. v. United States, 252 U. S. 140, 145.
Without going into a discussion of the question at length, it seems sufficient to say that the question of exemption must be confined to the statutes in force during the years when the taxes in this case were paid, i. e., from 1917 to 1921. The proceedings in Congress on the act of 1924 show a refusal to specifically exempt reciprocal and interinsurance companies or associations, though by the act of 1926 it did exempt them. This clearly indicates that in the judgment of Con *283 gress they were not exempt under the acts here in question. The statutes [4] as to exemption are quoted below.
In approaching the question of exemption we must regard the rule that the exemption should be construed strictly and in favor of the Government, and that it must be denied if there is doubt. Swan & Finch v. United States, 190 U. S. 143, 146; Cornell v. Coyne, 192 U. S. 418, 431; Bank of Commerce of Tennessee v. Tennessee, 161 U. S. 134, 146; Phoenix Fire & Marine Insurance Co. v. Tennessee, 161 U. S. 174, 177; New York Trust Co. v. United States, 63 C. Cls. 100, 102.
The claim for exemption must be clearly made out. Taxes being the sole means by which the State can maintain its existence, any claim on the part of anyone to exemption from the full payment of his share of taxes on any portion of his property must on that account be clearly defined and founded upon plain language. There must be no doubt or ambiguity in the language upon which the claim is based. It has been said that where there is a well-founded doubt it is fatal to the claim. The provision of the.statute involved here is section 231 (10) of the revenue act of 1918, 40 Stat. *284 1075, 1076, supra. It will be seen that this act, after enumerating- the character of companies to be exempt, uses the language “or like organizations of a purely local character.” The words “ purely local character ” give a very clear description. They refer to organizations whose business is confined to a locality, Avhose subscribers come from that locality. They pertain in a sense to a fixed place or a limited portion of the country, having reference to a certain determinate portion of country, limited and identified with a given area or region. We speak of a local question, local customs and observances, of a board administering local affairs, of a local statute which affects a particular locality or its inhabitants. So that the word “ local ” has a distinctly confined meaning and is to be contradistinguished from “ general,” that is, widespread, common to a greater number, large or unlimited in scope, not restricted in application or place, as opposed to “local.”
A few facts will clearly indicate that the association involved here was not local in character. It had 4,000 sub-sci’ibers. It did business in 27 States. Reciprocal and interstate exchanges were licensed to do business by it in 32 States, and it places a large amount of reinsurance with other companies. The statute intended to confine the exemption to associations or companies of a purely local character. The association here was not of that character, and is not within the exemption.
Further, the statute uses this language:
“ * * * the income of which consists solely of assessments, dues, and fees collected from members for the sole purpose of meeting expenses.”
The income of this association did not consist solely of “ assessments, dues, and fees collected from members.” If it did not consist solely of these, it is not within the exemption. It had income from large investments in certificates of deposits and United States bonds (see Finding IV), and this income, as stated, was deposited and commingled with the general fund of the association in bank and used for the purpose of paying expenses. It was income derived from investments. Certainly there is at least a grave doubt as to *285 whether the plaintiffs come within the exemption, and it must be held that they are not entitled to be exempted. The petition should be dismissed, and it is so ordered.
. Moss, Judge; Booth, Judge; and Campbell, Chief Justice, concur.

 Sections 504 and 505 of the revenue act of 1917, 40 Stat. 315, 316:
“ Sec. 504. That from and after the first day of November, nineteen hundred and seventeen, there shall be levied, assessed, collected, and paid the following taxes on the issuance of insurance policies:
‡ * * - * v
“(b) Marine, inland, and fire insurance: A tax equivalent to 1 cent qn each dollar or fractional part thereof of the premium charged under each policy of insurance or other instrument by whatever name the same is called whereby insurance is made or renewed upon property of any description (including rents or profits), whether against peril by sea or inland waters, or by fire or lightning, or other peril: Provided, That policies of reinsurance shall be exempt from the tax imposed by this subdivision.
“ Sec. 505. That every person, corporation, partnership, or association issuing policies of insurance! upon the issuance of which a tax is imposed by section five hundred and four, shall, within the first fifteen days of each month, make a return under oath, in duplicate, and pay such tax to the collector of internal revenue of the district in which the principal oflice or place of business of such person, corporation, partnership, or association is located. Such returns shall contain such information and be made in, such manner as the. Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, may by regulation prescribe ”
Sections 503 and 504 of the revenue act of 1918 (40 Stat. 1104) :
“ Sec. 503. That from and after April 1, 1919, there shall be levied, assessed, collected, and paid, in lieu of the taxes imposed by section 504 of the revenue act of 1917, the following taxes on the issuance of insurance policies, including, in the case of policies issued outside the united States (except those taxable under subdivision 15 of Schedule A of Title XI), their delivery within the United States by any agent or broker, whether acting for the insurer or the insured ; such, taxes to be paid by the insurer or by such agent or broker :
* * * * sjs
“(b) Marine, inland, and fire insurance: A tax equivalent to 1 cent on each dollar or fractional part thereof of the premium charged under each policy of insurance or other instrument by whatever name the same is called whereby insurance is made or renewed upon property of any description (including *278 rents or profits), whether against peril by sea or inland waters, or by fire or lightning, or other peril.
“ Sec. 504. That every person issuing policies of insurance upon the issuance of which a tax is imposed by section 503 shall m'ake monthly returns under oath, in duplicate, and pay sucli tax to the collector of the district in which the principal office or place of business of such person is located. Such returns shall contain such information and be made at such times and in such manner as the commissioner, with the approval of the Secretary, may by regulation prescribe.
“ The tax shall, without assessment by the commissioner or notice from the collector, be due and payable to the collector at the time so fixed for filing the return. If the tax is not paid when due, there shall be added as part of the tax a penalty of 5 per centum, together with interest at the rate of 1 per centum, for each full month, from the time when the tax became due.”
Title I. General Definitions
Section T (40 Stat. 1057) :
“ Section 1. That when used' in this act—
“ The term ‘ person ’ includes partnerships and corporations, as well as individuals;
“ The term ‘ corporation ’ includes associations, joint-stock companies, and insurance companies; * * *
“The term ‘ taxpayer ’ includes any person, trust, or estate subject to a tax imposed by this act.”

 Section 504 (d) of revenue act of 1917, 40 Stat. 316 :
“(d) Policies issued by any person, corporation, partnership, or association, whose income is exempt from taxation under Title I of the act entitled ‘An act to increase the revenue, and for other purposes,’ approved September eighth, nineteen hundred and sixteen, shall be exempt from the taxes imposed by this section.”
Section 503 (d) of the revenue act of 1918, 40 Stat. 1104 :
“(d) Policies issued by any corporation enumerated in section 231, and policies of reinsurance, shall he exempt from the taxes imposed by this section.”
Specifically section 11 (a) (10) of the revenue act of 1916, 39 Stat. 766-767 :
“ Sbc. 11. (a) That there shall not be taxed under this title any income received by'any—
* * ? * *
“ Tenth. Farmers:’ or other- mutual hail, cyclone, or fire insurance company, mutual ditch or irrigation company, mutual or cooperative telephone company, oi" like organization of a purely local character, the income of which consists solely of assessments, dues, and fees collected from members for the sole purpose of meeting its expenses.”
And section 231 (10) of the revenue act of 1918, 40 Stat. 1075-1076’:
“ Sbc. 231. That the following organizations shall he exempt from taxation under this title- — ■
“(10) Farmers’ or other mutual hail, cyclone, or fire insurance companies, mutual ditch or irrigation companies, mutual or cooperative telephone companies, or like organizations of a purely local character, the income of which consists solely of assessments, dues, and fees collected from members for the sole purpose of meeting expenses.”